2019 IL App (5th) 190324-U

NO. 5-19-0324

NOTICE
Decision filed 12/17/19. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| TESSA M. S., n/k/a Tessa R., | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Perry County. |
| | ) | |
| v. | ) | No. 15-D-32 |
| | ) | |
| ERIC T. S., | ) | Honorable |
| | ) | James W. Campanella, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE WELCH delivered the judgment of the court.
Justices Overstreet and Wharton concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's decision granting the petitioner mother's petition to relocate from Illinois to Florida with the parties' minor children is affirmed where the court's decision was not against the manifest weight of the evidence.

¶ 2    The petitioner, Tessa S., n/k/a Tessa R., filed a petition to relocate, seeking to relocate with the parties' minor children from Illinois to Florida. The respondent, Eric S., who is the minor children's father, opposed the relocation. In June 2019, the trial court granted the petitioner's petition to relocate. On appeal, Eric contends that the court's decision allowing the relocation was against the manifest weight of the evidence. For the reasons that follow, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4     The petitioner and the respondent were married on June 3, 2006.  Three children were born to the parties during the marriage, Claire S., born December 17, 2008, Cole S., born January 30, 2010, and Cortland S., born October 30, 2012.  The petitioner filed a petition for dissolution of marriage on April 7, 2015.  On June 26, 2015, a judgment for dissolution of marriage was entered, which incorporated a joint parenting agreement.  Pursuant to the joint parenting agreement, the parties agreed to share joint legal custody of the minor children with the petitioner being the primary residential parent and the respondent receiving reasonable and liberal parenting time.  At a minimum, the respondent had parenting time on alternating weekends, alternating holidays, two weeks during the summer, on his birthday, on Father's Day, and one-half of the day on each child's birthday.  Child support was reserved because the respondent was unemployed.

¶ 5     On May 13, 2016, the parties entered into an agreed order concerning child support, which provided that the respondent would pay monthly child support to the petitioner in the amount of $600, despite his continued status as unemployed.  On January 13, 2017, an order was entered by the trial court addressing the fact that the respondent was $1800 in child support arrears and ordering him to pay it in full by June 20, 2017, with a monthly payment of $120.

¶ 6     On January 18, 2018, the petitioner filed a notice that she intended to relocate to Florida in the near future with the minor children.  See 750 ILCS 5/609.2(c), (d) (West 2016).  Although the notice had a place for the respondent to sign indicating his consent to the relocation, the line was blank.  Because the respondent did not sign the notice to

2

relocate, on February 6, 2018, the petitioner filed a petition seeking the trial court's permission to relocate. See *id.* § 609.2(f). In the petition, the petitioner indicated that she had married Mitchell R. on June 20, 2016; that he was a career air force airman; that they had a five-month-old daughter who resided with the petitioner; and that Mitchell was recently transferred from England to Eglin Air Force Base near Destin, Florida, which was approximately 10 hours from Nashville, Illinois, where the petitioner and the four minor children lived. The petition further indicated that the petitioner and Mitchell had purchased a home in Florida in December 2017, that Mitchell provided health insurance for the parties' children, and that the respondent's failure to pay child support had forced the petitioner and the children to reside with her parents in Nashville, Illinois, since the parties' divorce. The petition asserted that the petitioner's parent's home was crowded and that the living situation had caused severe physical and financial strain on her and her parents, which made it difficult to raise her children and maintain her employment; that her and the children's quality of life was terrible; and that her home in Florida was spacious, had a bedroom for each child, and was located one block from an elementary school. The petition further asserted that the relocation to Florida would greatly improve the quality of life of the family as a whole and that, if allowed to relocate, she would return the children to Nashville for visitation at least five times each year for extended stays. Moreover, the petition asserted that the respondent had also expressed a desire to relocate to Florida.

¶ 7     On the same day, the petitioner filed a petition for rule to show cause, asserting that the respondent had failed to make child support payments since January 2017, and he was in an arrearage of approximately $10,500. On February 15, 2018, the trial court entered a

3

rule to show cause order, directing the respondent to show cause why he should not be held in contempt for failing to comply with the court's January 13, 2017, order regarding child support. On March 12, 2018, the respondent filed a response to the petition to relocate, which requested that the court deny the petitioner's petition to relocate. In the response, the respondent admitted that he had discussed the possibility of moving to Florida with the petitioner but asserted that it was nothing more than a discussion. That same day, he filed a response to the petition for rule to show cause, which admitted that an arrearage existed but asserted that he had been unemployed for significant periods of time since the entry of the court's support order, that he had been unable to pay the ordered amount, and that he had provided in-kind support for the children during this time. The respondent also asserted that, during this time, the petitioner was separated from Mitchell, that the parties had discussed reconciliation, and that he offered to make the required payments, but the petitioner declined to accept the money. The respondent also filed a petition to modify parenting time, seeking the majority of the parenting time if the court denied the petitioner's petition to relocate but she relocated to Florida without the minor children.

¶ 8      A hearing was held on March 13, 2018, regarding all pending motions, which included the rule to show cause and the petition to relocate. The trial court first addressed the rule to show cause. The petitioner testified that the respondent was in arrears for child support and court-ordered attorney fees in the amount of $10,435. She never told the respondent that he did not have to pay the amount owed, but she acknowledged having a conversation with him via text message where she assured him that she would not take him back to court over the arrearage and that she was willing to be patient with him because he

4

was seeking employment. However, after that, he made no attempt to pay her the amount owed. The respondent testified regarding his attempts at obtaining employment and that he eventually obtained part-time employment working as a bus driver for Schmale Bus Service, which was owned by the petitioner's father. He was still looking for full-time employment. When he contacted the petitioner about paying some of the money he owed, she told him not to worry about it because she knew that money was tight for him. Printouts of the text messages regarding this exchange were admitted into evidence.

¶ 9 The respondent also testified that he had several conversations with the petitioner about reconciling even though she was pregnant with Mitchell's child. The first conversation occurred on Easter Sunday in 2017 in the presence of her parents; at that time, the petitioner expressed regret over their divorce, indicated that she had made a mistake marrying Mitchell, and indicated that she was planning on divorcing Mitchell. The respondent told her that he was willing to reconcile because they had three children together, and they had been together for 10 years before their divorce. After that conversation, they spoke on the phone daily, regularly communicated via text messages, and attended several of the same activities involving the children. Although the petitioner had filed a petition to dissolve her marriage with Mitchell, and the respondent believed that there was a possibility that they would get remarried, she unexpectedly reconciled with Mitchell after the baby was born and withdrew the petition for dissolution of marriage. The respondent acknowledged that a child support arrearage existed, acknowledged that he owed the money, and indicated that he had $1000 to pay her immediately.

5

¶ 10    After hearing the testimony concerning the rule to show cause, the trial court found the respondent in indirect civil contempt and sentenced him to six months in jail with the ability to purge the sentence by payment of $1000 to petitioner that day and by timely paying the $600 toward current support and $400 toward the arrearage each month. The court also ordered the parties to participate in mediation regarding the petitioner's petition to relocate.

¶ 11    Mediation was subsequently held but did not result in an agreement amongst the parties. Thereafter, on May 10, 2018, the trial court entered an order directing the parties to submit to a psychological evaluation conducted by Frank Kosmicki, Ph.D., a licensed clinical psychologist. The evaluation was completed on November 29, 2018, and an addendum to the evaluation was completed on January 14, 2019.

¶ 12    The hearing on the petitioner's petition to relocate was held on June 4, 2018, and the following testimony was presented. The petitioner testified that she was 35 years old and had been a teacher at an alternative school in Centralia, Illinois, for five years. She had three children with the respondent: Claire S., who was 10 years old, Cole S., who was 9 years old, and Cortland S., who was 6 years old. Since the parties' separation, the minor children had primarily resided with her, and the respondent received parenting time. The children attended Nashville grade school, did very well in that school, and were involved in softball, baseball, basketball, and swimming. She married Mitchell in June 2016; he was in the military and was stationed at Eglin Air Force Base in Crestview, Florida. She sought relocation to Crestview, Florida, so she could live with her husband. She was currently living with her parents and had been living there approximately one month.

6

Before that, she lived in a two-bedroom rental home in Nashville; the rent was $1350 per month. She lived in the rental home for one year, and, prior to that, she lived with Mitchell's cousin. She moved in with Mitchell's cousin because she had been living with her parents, but the "tension was very high" there as her parents were not supportive of her marriage to Mitchell. She explained that she had to live with her parents because the respondent was not paying child support. She indicated that, since the separation, the respondent had not regularly paid child support, that he did not help her with the children's school costs, and she had to rely on her family because of his lack of financial support. Although he was currently in arrears in child support, the petitioner acknowledged that he was current with the March 2018 order.

¶ 13 At her parents' house, the three older children shared one bedroom, and the youngest child slept in the petitioner's room. She did not pay rent while living there currently, but she had paid rent when she lived there before. She acknowledged that Mitchell's paycheck was deposited into their joint checking account, and she used that in addition to her paycheck to pay living expenses. Mitchell earned approximately $75,000 to $80,000 annually, and she earned $30,000 annually.

¶ 14 The petitioner explained that her extended family in Nashville was volatile and that her parents were not supportive of her and Mitchell's relationship. Although the children loved her parents, the petitioner explained that her parents did things to alienate the children from her. Specifically, she explained that her parents said negative things about her and Mitchell to the children. The respondent's parents lived in Nashville, but the petitioner explained that the respondent did not have a relationship with his father, the children did

7

not have much of a relationship with their paternal grandfather, and the respondent's mother was an alcoholic. She further explained that the respondent's relationship with his mother was volatile and that they had argued in front of the children in the past. She relayed an incident where the respondent got into a heated argument with his mother, and he destroyed items in her house. She acknowledged that she did not have any extended family in Florida.

¶ 15 The petitioner and Mitchell owned a five-bedroom house in Crestview, which was across the street from a school. Several children lived in the subdivision. She indicated that, if she was granted leave to relocate, she would not work initially so that she could help the children with the transition. She would be able to stop working for a period of time because they would not have the financial burden of running two households. She eventually wanted to resume employment, and her teaching certificate would transfer to Florida. The pay in Florida would be comparable to what she was making in Illinois.

¶ 16 According to her research, the children would attend a school in Florida that was comparable to their Nashville school. She also found comparable extracurricular activities for them in Florida. Because the softball and baseball schedule started earlier in Florida, the children would be finished with those sports in time to visit with the respondent during the summer. She did not have any concerns over the children switching schools.

¶ 17 The petitioner believed that the relocation would benefit the minor children because it would provide them with structure, safety, a two-parent household where she and Mitchell would be available to them both emotionally and physically, and a place to call their own. She testified that the military provided childcare on base and that she would

8

coordinate with other parents if she needed help getting the children to their respective extracurricular activities. She explained that the move would give them an opportunity to make new friends and have new experiences. The move would also eliminate a lot of the drama with her and the respondent's extended families. She believed that she would be better supported in Florida with Mitchell than by the extended families in Illinois. She described her parents' assistance as conditional, noting that, whenever they disagreed with what she was doing in her life, they would make it "hard" on her. She also noted that her standing with them was subject to change at a moment's notice.

¶ 18 The petitioner testified that Mitchell was stationed in England when they married but that he was transferred to Florida in August 2017. Since their marriage, the longest period of time that they had been under the same roof was 30 days. However, she had known Mitchell since high school, and they were in a serious relationship at that time; the relationship ended due to her father's interference. She acknowledged that she filed for divorce from Mitchell in August 2017 but explained that she was pregnant with her youngest child, was having medical issues where she was placed on bed rest, and was suffering from depression. She reconciled with Mitchell in September 2017, and the petition for dissolution of marriage against Mitchell was eventually dismissed on January 18, 2018. She was currently seeking treatment for depression. She indicated that she would remain in Illinois with the minor children if the trial court denied her request to relocate.

¶ 19 The petitioner described her relationship with Michell as loving and supportive. She explained that Mitchell had built a strong relationship with the children, that he took time to play with them, that he helped them with homework, and that he helped them work

9

through their problems. Although Mitchell lived in Florida, the children interacted with him every day through FaceTime. Because the respondent did not have medical insurance, the children were covered under Mitchell's insurance.

¶ 20 The petitioner submitted a proposed parenting plan to the trial court; she proposed that the children would spend major holidays and the summer with the respondent. She explained that her proposed plan gave the respondent more parenting time with the children than he had under the current schedule. She testified that, if she visited Illinois when the respondent did not have scheduled parenting time, she would allow him additional time with the children. She also did not have any objection to the respondent visiting the children in Florida.

¶ 21 The petitioner testified that the respondent did not fully exercise his allotted parenting time. She explained that he dropped the children off early almost every weekend, sometimes picked them up late, frequently asked her to pick them up from practices, and regularly dropped them off at her parents' house so that he could play golf or hang out with his friends. The petitioner testified that the respondent was a basketball coach for Cole and had helped with Cole's recreational baseball league. Since the respondent had been working full-time, he had been unable to attend every game. She acknowledged that the respondent might not be able to assist in coaching if she relocated to Florida with the children, but she believed that the children could still play summer sports if they spent the summer with him. She also testified that since he had obtained new employment, he was no longer available to help her get the children to their various activities.

10

¶ 22 The petitioner opined that the respondent was unable to parent day-to-day because he got easily frustrated with the children. She described incidents where the respondent grabbed Cortland's face in anger, where he yelled at the children, where he yelled at her in front of the children for not practicing sports with them, and where he called her names, such as "fat ass" and stupid, in front of the children. She testified that the respondent's relationship with the children was confusing for them because he was unreliable. She believed that he was more concerned with the children's sports than with their school; at the time of his deposition, he did not know the names of their teachers; and he did not attend their school's open house or their parent-teacher conferences. She described various incidents where she needed the respondent's help with the children, and he was unable or unwilling to help her; some of these occasions occurred when he was unemployed. She believed that he was objecting to her relocation because he would be required to take more responsibility and accountability for the children if she was living in Florida.

¶ 23 Mitchell testified that he was 39 years old and was employed as an intelligence analyst for the United States Air Force. He testified that he had known the petitioner for approximately 20 years, that she was the love of his life, and that he would do anything for her and her children. He had a daughter with the petitioner, and the petitioner's three older children had a great relationship with their younger sister. He opined that he had a great relationship with the petitioner's children; he testified that they had fun together, did normal things together, such as playing sports, watching movies, listening to music, and went to the beach in Florida. The total amount of time that he spent with the children in the last year was approximately 80 to 85 days. However, he interacted daily with the

petitioner and the children through phone calls and FaceTime. He also helped the children with their homework over the telephone or FaceTime. Based on Mitchell's personal experience, the respondent did not fully exercise his parenting time; he explained that the respondent usually brought the children home early. He testified that the petitioner had a strong relationship with her parents but that it could be very demanding as her parents' support was conditional. He believed that a move to Florida would enable the petitioner to be a better parent.

¶ 24 Whitney Meyer, Mitchell's cousin, testified that the petitioner and the three minor children resided with her from February 2018 until May 2018. Whitney lived in a two-bedroom house in Nashville. When the petitioner lived with her, the petitioner usually slept on the couch, two of the children slept in the second bedroom, and one slept on the other couch. Based on her personal knowledge, when the respondent had the children for his parenting time, he usually brought them home early. She had also observed Mitchell's interactions with the children and noted that the children were happy and comfortable with him. She had also observed Mitchell helping Claire with her homework over the telephone.

¶ 25 The respondent testified that he currently lived in Nashville, Illinois, in a two-bedroom rental home. He made a third bedroom in the dining room for Claire so that she could have her own space. He had only recently moved into the rental house, and before that, he lived with his mother. He was currently employed as an associate representative at Thrivent Financial and had been employed there since May 2018. Since the parties' separation, he had four or five different jobs. He denied ever dropping the children off before noon on a Sunday. He testified that he spent additional time with the children

12

through their extracurricular activities.  He opined that he would not see the children as much if the petitioner relocated to Florida, and he would not be able to regularly coach their sporting events like he had in the past.  He did not think that the children would be able to participate in summer sports in Nashville if they spent the summer with him because the summer sports started when school was in session.  He cherished the time that he spent with the children playing sports.  He acknowledged that Claire had expressed a desire to move to Florida, that Cole wanted to remain in Illinois, and Cortland was too young to understand.  He testified that there had been times where he paid child-related expenses other than child support.

¶ 26    The respondent testified that the children had a loving relationship with their maternal grandparents, who lived in Nashville.  He also testified that the petitioner had two brothers and a sister that lived in the area; that they were all married and had children, who were close in age to the parties' children; and that they had been involved in the minor children's lives.  The petitioner also had a cousin who lived in the area and who had two children of similar age to Cole and Cortland.  The respondent had a sister who recently relocated to the Nashville area, and she had two children.  He also had a grandmother that lived in the area.

¶ 27    The respondent acknowledged that he got frustrated with the children, that he was occasionally stressed while parenting, and that he would occasionally lose his temper with them.  He acknowledged that he told the children that their mother wanted to move them away from everything in Nashville, that she only cared about herself, and that he had sent the petitioner a text message saying, "get ready for the court battle from hell."  He also

admitted to telling the petitioner to get off her "fat ass" and practice with the children when she was pregnant. The children were in the house when he said this. He also acknowledged that, when he lived with his mother, he would sometimes argue loudly with her in front of the children. He further admitted that there was an incident where he got into a heated argument with her and destroyed things in her house. He acknowledged that his mother assisted him financially after his separation from the petitioner but denied that his mother paid his child support obligation.

¶ 28   Dr. Kosmicki's evaluation and addendum, which were admitted into evidence, made the following findings and recommendations. In his evaluation, Dr. Kosmicki interviewed the petitioner, the respondent, and the parties' three children. The petitioner reported to Dr. Kosmicki that her father was controlling, emotionally abusive, and physically abusive, but she had no other option but to live with her parents after her separation from the respondent. She had reported that she began experiencing anxiety and depression during her pregnancy with Mitchell's child, which was exacerbated by the fact that Mitchell was overseas at the time and her parents were not being emotionally supportive. During that time, she filed for divorce and relied on the respondent for emotional support. However, at the time of Dr. Kosmicki's interview with her, she reported that her marriage with Mitchell was solid. She believed that the move to Florida would allow her to depend less on her parents and avoid her father's controlling behavior. She reported that pressure from her father and the respondent made it difficult to make her own decisions. She believed that her family and the respondent were united in preventing the relocation with the

14

children.  She reported that she was being ostracized by her siblings, and her younger sister prohibited her from having any contact with the sister's children.

¶ 29    The respondent reported that he believed that the petitioner was impulsive and expressed concerns about her plan to relocate because she had not lived with Mitchell yet, and the children had not been around Mitchell enough.  He believed that she remarried too soon after their divorce, and he worried that the marriage would not last.  He admitted that he sometimes used the petitioner's parents to watch the children during his parenting time.  He reported that he was on good terms with the petitioner's parents, and he played golf with her father.  He reported that he had been living with his mother since he sold the marital home, that she was controlling and difficult to live with, that she was an alcoholic, that they argued about her drinking, and that he was unhappy in this living situation.  He reported that his relationship with his father was strained in that his father was emotionally distant and did not initiate contact with him.

¶ 30    Claire indicated that she wished to relocate with her mother to Florida because she wanted to escape the distressing family dynamics, and there was more room in the Florida house.  She reported that she liked Mitchell and that he treated her and her brothers very well.  She reported that she was not close with her paternal grandmother and that it was difficult living with her maternal grandparents because of her grandfather's temper and his treatment of her mother.

¶ 31    Cole indicated that he did not want to move to Florida because everyone was in Illinois.  He also reported that he was especially close with a cousin and did not want to move away from him.  However, Dr. Kosmicki believed that the respondent pressured Cole

15

to stay in Nashville and that Cole's reason for not wanting to move echoed what the respondent had told the children, *i.e.*, that everyone was in Illinois. Cole reported that his father became very angry when discussing the petitioner and Mitchell and had told Cole that the petitioner was taking him away from the respondent.

¶ 32   In his findings, Dr. Kosmicki indicated that the petitioner's father had controlled her through intimidation, physical force, and financial leverage and that he continued to use physical violence and threats to influence her in adulthood. Dr. Kosmicki opined that the petitioner's marriage to Mitchell was less impulsive and erratic than may be assumed and that the petitioner was frequently faced with a choice between falling in line with her family's wishes or being ostracized and abandoned by them. He believed that those family dynamics provided a context for her previous separation from Mitchell and her efforts toward reconciliation with the respondent.

¶ 33   Noting reports that the respondent often lost his temper with the children and that he relied on the petitioner and her parents during his parenting time, Dr. Kosmicki opined that the respondent was not prepared to manage the emotional demands of parenting on his own over time without considerable support. Dr. Kosmicki indicated that the respondent appeared to have significant problems dealing with stress, emotional demands, and frustration, which impacted his parenting. Dr. Kosmicki believed that the petitioner's financial dependence on her parents exacerbated long-standing problematic dynamics in the family system and that the respondent's failure to provide support was a prominent factor in creating and maintaining that unhealthy situation. He opined that the grandparents' over-involvement appeared to be perpetuating unhealthy family dynamics

and that the respondent's alliance with the petitioner's father appeared to be a pact born out of self-interest and convenience. He further noted that all three children reported being uneasy in their paternal grandmother's house.

¶ 34    In his addendum to the evaluation, Dr. Kosmicki recommended that the petitioner be allowed to relocate with the minor children with the respondent receiving generous parenting time. In making this decision, Dr. Kosmicki noted that the respondent had used anger and coercion with his children to influence their preferences, had repeatedly disparaged the petitioner and Mitchell to the children to alienate them from their mother and Mitchell, and that his behavior raised questions as to his willingness and/or ability to place the needs of the children before his own and his willingness and/or ability to facilitate and encourage a close and continuing relationship between the children, the petitioner, and Mitchell. Dr. Kosmicki opined that a move to Florida with the children offered the petitioner an opportunity to provide stability for the children without having to rely on her parents for financial support and submit to her father's demanding and controlling behaviors.

¶ 35    Moreover, Dr. Kosmicki's January 28, 2019, evidence deposition was entered into evidence. In his deposition, Dr. Kosmicki opined that, based upon a reasonable degree of certainty, it was in the minor children's best interests to be allowed to relocate to Florida with their mother. He explained that he felt that a move to Florida with their mother was a better situation for them at this point. He also opined that the respondent should have very liberal parenting time with the children.

17

¶ 36 Following the hearing, on June 18, 2019, the trial court entered a written order, granting the petitioner's petition to relocate with the minor children to Florida. In making this decision, the court considered the requisite statutory factors set forth in section 609.2(g) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/609.2(g) (West 2018)), which governs relocation. This appeal followed.

¶ 37                                    II. ANALYSIS

¶ 38 On appeal, the respondent contends that the trial court's determination that the petitioner's relocation to Florida was in the best interests of the minor children was against the manifest weight of the evidence.

¶ 39 Section 609.2 of the Act governs the relocation of minor children from Illinois. 750 ILCS 5/609.2 (West 2018). A parent who has been allocated the majority of the parenting time may seek to relocate with the minor children. *Id.* § 609.2(b). If the nonrelocating parent objects to the proposed relocation, then the other parent must file a petition seeking court permission to relocate. *Id.* § 609.2(f). When determining whether relocation is in the minor child's best interests, the court is required to consider the following 11 factors: (1) the circumstances and reasons for the intended relocation; (2) the reasons, if any, why a parent is objecting to the intended relocation; (3) the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment; (4) the educational opportunities for the child at the existing location and at the proposed new location; (5) the presence or absence of extended family at the existing location and at the proposed new location; (6) the anticipated impact of the

18

relocation on the minor child; (7) whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs; (8) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation; (9) possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child; (10) minimization of the impairment to a parent-child relationship caused by a parent's relocation; and (11) any other relevant factors bearing on the child's best interests. *Id.* § 609.2(g)(1)-(11).

¶ 40    The paramount question in relocation cases is whether the move is in the child's best interests. *In re Marriage of Eckert*, 119 Ill. 2d 316, 325 (1988). Thus, the party seeking relocation must establish by a preponderance of the evidence that the relocation is in the child's best interests. *In re Marriage of Kavchak*, 2018 IL App (2d) 170853, ¶ 65. This determination is made on a case-by-case-basis, which depends, to a great extent, upon the circumstances of each case. *Id.* A trial court's determination of what is in the child's best interests should not be reversed unless it is against the manifest weight of the evidence. *Id.* A reviewing court does not reweigh the competing considerations; instead, it reviews the trial court's decision deferentially. *Id.* This deference is appropriate because the trial court had the opportunity to observe both parents and, if applicable, the children and, thus, is able to assess and evaluate their temperaments, personalities, and capabilities. *Id.* Thus, the presumption in favor of the result reached by the trial court is always strong and compelling in this type of case. *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 32. A court's decision is against the manifest weight of the evidence only where the opposite conclusion

19

is clearly apparent or where its findings are unreasonable, arbitrary, or not based on the evidence presented. *Kavchak*, 2018 IL App (2d) 170853, ¶ 65.

¶ 41    Here, the trial court first considered the circumstances and reasons for the relocation to Florida. The court noted that the petitioner had remarried; that her husband was stationed in Crestview, Florida; that he will be stationed there for at least the next four years at which time he could choose to retire; and that they had purchased a house in Crestview, which appeared more than adequate to provide stability for the petitioner and the minor children. The court considered that the petitioner and Mitchell had a child together and that all of the children appeared to get along very well. The court further found that Mitchell was employed with benefits, that he grossed approximately $75,000 per year, that the petitioner was certified to teach in Florida, and that Mitchell could not transfer to Scott Air Force Base or any other close proximity Air Force facility in Illinois.

¶ 42    The respondent acknowledged that no bad faith could be ascribed to the petitioner's reason for relocation but contended that the trial court failed to consider the petitioner's filing a petition for dissolution of her marriage to Mitchell, her attempted reconciliation with the respondent, and her subsequent withdrawal of the dissolution petition. The respondent contends that this conduct was consistent with her impulsive personality and reflected her mental health issues for which she was receiving therapy. However, we note that the petitioner's history with Mitchell and the respondent was thoroughly addressed in Dr. Kosmicki's evaluation and the addendum, which was heavily relied on by the court in making its decision on relocation. In his evaluation, Dr. Kosmicki noted that the petitioner and Mitchell had known each other for 20 years, that she was suffering from depression

20

and was pregnant at the time that she filed for divorce, and that her parents were not supportive of her marriage to Mitchell. Moreover, we note that, despite this history, Dr. Kosmicki recommended that the petitioner be allowed to relocate with the minor children to Florida.

¶ 43 Second, the trial court considered the reasons why the respondent objected to the relocation. The court noted that the respondent offered evidence that relocation would be a gross inconvenience to his ability to interact with his children on a timely basis, but the court found that such evidence was obvious and inevitable. The court considered that the respondent believed that the petitioner was seeking to relocate for convenience only but found that he had offered little to no evidence to contradict the petitioner's evidence that the relocation would be in the children's best interests. The court found that the respondent offered no contradictory evidence to the petitioner's testimony that relocation would greatly improve the quality of life for the family as a whole. The court further found that very "damming [*sic*] evidence" was elicited that the respondent agreed not to contest the move if the petitioner would forgive his child support obligation. The court also found "equally damming [*sic*]" the respondent's failure to offer any evidence to contradict Dr. Kosmicki's findings, his report, or his recommendation.

¶ 44 The respondent argues that the trial court minimized the effect that relocation would have on his ability to interact with the children and erred in finding that he had agreed to the petitioner's relocation. We disagree. The court's order indicates that it considered evidence that a relocation would interfere in the respondent's ability to interact with his children. The court did not minimize this evidence but merely acknowledged that it was

21

inevitable that the minor children's relocation to a different state would interfere with his ability to interact with them. Also, although the respondent testified that he never agreed to a relocation, the petitioner testified that he was initially in agreement with the move and had mentioned moving to Florida himself because he did not have gainful employment. The petitioner further testified that she agreed with the recitation of facts in Dr. Kosmicki's report, which stated that she had agreed to absolve the respondent of his child support arrearage and that she believed that the respondent would sign off on the agreement to relocate. The report also indicated that the respondent admitted to becoming entrenched in his decision to object to the relocation in part because of the petitioner's attempts to "push and her use of child support as 'leverage.' " As noted above, it is not for this court to reweigh the conflicting evidence. The credibility of witnesses is for the trier of fact, who is in the best position to observe witnesses and their demeanor and assess the relative credibility on issues of fact. *In re Marriage of Malec*, 205 Ill. App. 3d 273, 285 (1990). Moreover, we note that the respondent failed to offer contradictory evidence to rebut Dr. Kosmicki's report, findings, and recommendations, except for his own self-serving testimony.

¶ 45    Third, the trial court considered the history and quality of each parent's relationship with the minor children and whether either parent had substantially failed or refused to exercise parental responsibilities. In its order, the court found that, while ample evidence was presented that the respondent had a relationship with his children, the admissions that he made in his deposition, which were reaffirmed during his trial testimony, revealed that his relationship with his children was sometimes volatile, even to the extent of being

22

physical. The court also found that, while he had the opportunity to exercise his parenting time on a regular basis, other than his self-serving testimony, it was never shown that he exercised his parenting time to the fullest extent allowed to him and quite contradictorily returned the children on a consistent basis anywhere from two to six hours before he actually had to. The court also noted that the respondent had failed to make court-ordered child support payments, was $10,435 in arrears, and was found in contempt. Although he eventually started paying the court-ordered child support, the court found that his past failure to pay support caused the petitioner extreme financial hardship and difficulties and was the direct cause of her having to move in with her parents, with whom she had a less than healthy relationship.

¶ 46 The respondent argues that the trial court's finding that he was sometimes volatile with the children directly contradicts the court's decision to grant him unrestricted, extended parenting time. He also argues that the evidence showed that not only did he exercise his parenting time in the context of the informal arrangements with the petitioner, but he was also heavily involved in the coaching of the minor children's sports activities. He finally argues that the court's finding that the arrearage was a cause of financial hardship for the petitioner was not supported by the evidence.

¶ 47 Although the trial court found that the respondent's relationship with the children was sometimes volatile, which was supported by the evidence, there was no request, nor argument made, for restricted parenting time; there was no argument made that time with the respondent would seriously endanger the children's mental, moral, or physical health or that time with him would significantly impair the children's emotional development as

23

required for such a restriction.  See 750 ILCS 5/603.10 (West 2018).  Thus, this issue was not before the court.  With regard to parenting time, the petitioner testified that the respondent failed to fully exercise his parenting time.  Her testimony was corroborated by Mitchell and Whitney, who both witnessed the respondent dropping off the children early on Sunday.  Thus, the court's finding was supported by the evidence.  As for the child support arrearage, based on the evidence presented, it was not unreasonable for the court to find that the respondent's failure to pay child support was a direct cause of the petitioner having to move in with her parents because she and Mitchell were financially unable to support two households while also being financially responsible for four children.

¶ 48    Fourth, the trial court considered the educational opportunities for the children in Nashville and in Florida.  The court stated that the only evidence presented was that the educational opportunities for the children were pretty much equal and if either location were to be favored, it would have to be the Florida location because Florida schools offered music instruction much earlier than Nashville schools.  The court noted that, although the population of Crestview was approximately 40,000, the class size at the Crestview school was roughly equivalent to the class size in the Nashville school.  These findings were supported by the evidence.

¶ 49    The trial court next considered the fifth factor, the presence or absence of extended family in Nashville and Florida.  The court noted that there was no doubt that the parties both had extended family in Nashville and that they had no extended family in Florida.  The court also indicated that, under normal family circumstances, this would weigh heavily in favor of denying relocation.  However, the court found "glaringly abnormal

circumstances here." Relying on the testimony of the parties and witnesses, as well as Dr. Kosmicki's evaluation, the court found that the extended family of the parties may be doing more harm than good for the children's psychological, emotional, mental, and physical well-being. The court noted that the uncontroverted evidence was that the petitioner's father was intimidating, prone to use physical force, controlling, demeaning, and capable of using financial leverage to affect the petitioner's behavior and his grandchildren's destiny; that the uncontroverted evidence revealed that the respondent's mother had issues with alcohol as well as a volatile relationship with the respondent; that the evidence revealed that the petitioner's father was reluctant to accept Mitchell while he supported and had a cordial relationship with the respondent, her ex-husband; and that the uncontroverted testimony revealed that the petitioner's siblings refused to speak to or associate with her and would not allow her to associate with their children. The court indicated that the extended family's support had been characterized as conditional and only there when convenient and when the petitioner cooperated at their direction. Conversely, the court noted that, while there was no extended family in Florida, Mitchell had been very supportive, had a great relationship with the children, and even insured their respective medical and hospitalization needs.

¶ 50 The respondent contends that the absence of extended family in Florida strongly supports the denial of relocation. In making this argument, the respondent disagrees with the court's finding that the petitioner's relationship with her parents is conditional, that the extended families may be doing more harm than good for the children's well-being, and appears to solely blame the petitioner for the family dynamics. Also, the respondent

25

contends that the trial court placed too much weight on Dr. Kosmicki's report where he did not interview any of the grandparents. However, we note that the respondent did not present any evidence to contradict the findings made in Dr. Kosmicki's report or the petitioner's testimony about her relationship with her family. The findings made by the court were supported by the uncontradicted evidence offered at the hearing.

¶ 51 Sixth, the trial court considered the anticipated impact of the relocation on the children. The court noted that ample evidence was provided that Claire was in favor of the move; that Cole, who was younger and more emotionally reactive, was more reluctant to change; and that Cortland was too young to understand the implications of relocating. As explained above, the court had also considered the parties' family dynamics and how those dynamics impacted the minor children's well-being.

¶ 52 The respondent contends that the trial court failed to fully and clearly assess the impact of removing the children from the only environment that they had ever known, including extended family, school, friends, and extracurricular activities in which the respondent had been heavily involved. We disagree. Contrary to the respondent's argument, we find that the court adequately considered the potential impact of the relocation on the children. Evidence was presented about the minor children's participation in extracurricular activities in Nashville, about the respondent's involvement in those activities, and about the minor children's relationships with their extended families, including their relationships with cousins who were of a similar age. Evidence was also presented that the minor children would be able to participate in the same extracurricular activities while living in Florida, that the Crestview house was located next to a school and

within a subdivision where several children lived, and that the children may be allowed to participate in summer activities while living with their father. The court considered the above evidence, determined that relocation is appropriate, and we are not to reweigh the evidence. Thus, we cannot say that this finding was against the manifest weight of the evidence.

¶ 53 Seventh, the trial court considered whether it would be able to fashion a reasonable allocution of parental responsibilities between the parents if the relocation occurred. The court found that the allocation of parental responsibilities and parenting time could be reasonably accomplished by giving the respondent the majority of the summer vacation time and extended major holiday visitation. This finding was supported by the evidence.

¶ 54 Eighth, the trial court considered the wishes of the children, in light of their maturity and ability to express reasoned and independent preferences as to relocation. The court noted that it had taken the children's wishes into account in making its decision as the children's wishes were set forth in Dr. Kosmicki's report.

¶ 55 Ninth, the trial court considered the possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the children. The court noted that the petitioner had expressed a willingness to accompany the children to Illinois for their extended parenting time with the respondent and that it appeared that each party had the resources necessary to assist in paying for the travel.

¶ 56 The respondent argues that the children are too young to travel unaccompanied and, thus, this is not a factor in favor of relocation. However, we note that the trial court found

that the petitioner was willing to accompany the children to Illinois for their extended visits, and there was no evidence presented to the contrary.

¶ 57 Tenth, the trial court considered the minimization of the impairment to a parent-child relationship caused by a parent's relocation. The court found that by awarding the respondent a substantial amount of parenting time during the summer and major holidays, the court has minimized the impairment to his parent-child relationship as best as possible under the circumstances of this case.

¶ 58 The respondent contends that any minimizing of the impact of relocation is arbitrary and unreasonable because the trial court failed to fully and clearly assess the impact of removing the children from the only environment that they have ever known. As previously explained, we disagree with the respondent's contention that the court has not fully considered the impact of removing the children from Nashville. The court thoughtfully considered the evidence presented on this issue and determined that relocation was appropriate. We will not reweigh this evidence.

¶ 59 The eleventh factor considered by the trial court was any other relevant factors bearing on the children's best interests. The court stated that it relied heavily on Dr. Kosmicki's evaluation and the addendum in which he recommended that a move to Florida with the minor children offered the petitioner an opportunity to provide stability for her children without having to rely on her parents for financial support and without having to submit to her father's demeaning and controlling behaviors. The court further believed that statement summed up the content of Dr. Kosmicki's revealing evaluation and the evidence obtained at trial.

¶ 60    The respondent contends that there was no evidence presented to suggest that the parties' children were in an unstable environment and that the trial court's findings concerning the petitioner's financial dependence upon her parents as well as her father's demeaning and controlling behaviors were not supported by the record. We strongly disagree. The record provides ample support for the court's findings here, and the respondent has not presented any evidence to the contrary about the petitioner's family dynamics.

¶ 61    Based on the trial court's order and the record before us, we find that the court thoughtfully considered each statutory factor for relocation and took great care in making this difficult decision. We find no basis for concluding that the court's order was against the manifest weight of the evidence. Thus, we affirm the court's order granting the petitioner's petition to relocate with the minor children.

¶ 62                          III. CONCLUSION

¶ 63    For the foregoing reasons, the judgment of the circuit court of Perry County is hereby affirmed.


¶ 64    Affirmed.